# GRAND TRUNK WESTERN RAILWAY COMPANY
## *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 153. Argued January 21, 22, 1920.—Decided March 1, 1920.

In settling with a railroad company under its current contract for mail transportation, the Postmaster General may deduct overpayments made under earlier contracts without waiting for their amount to be ascertained by suit. P. 120.

The right of the United States to recover such overpayments is not barred by time. P. 121.

The rule that a long-continued construction of a statute by a department of the Government should not readily be changed to the injury of parties who have relied upon it in contracting with the Government, does not apply to a long-continued practice of making overpayments, due to a mistake of fact. *Id.*

The obligation to carry the mail at the rates fixed by Congress attaches to a land-aided railroad like an easement or charge; a company purchasing under foreclosure takes the road with notice of the obligation; and its duty to perform is not affected by the fact that it received none of the land and obtained no benefit from the grant. *Id.*

Where a railway-aid grant is made by act of Congress to a State with the provision that over the railway to be aided the mail shall be transported at such price as Congress may by law direct, a company which before completion of its road applies to the State for the land to aid in such completion, receives the State's patent therefor, reciting that such is the purpose, and expressly assents to the terms and conditions of the granting act and proceeds to dispose of the land, is subject to the duty imposed, whether it was in fact aided by the grant in building its road or not; nor is its successor in any better position to question this effect of accepting the grant when it acquires the first company's property through a foreclosure to which that company's interest in such lands was made subject as after-acquired property covered by the mortgage. P. 122.

Where lands granted as railway-aid lands by Congress to a State are accepted by a railroad company and aid in the construction of its railroad, the obligation to carry the mails, as stipulated in the grant-

ing act, attaches to the road so aided, however disproportionate the aid to the cost of construction, and this notwithstanding the company, in accepting the land and assuming the burden, may have relied upon other lands applied for at the same time and included in the same state patent, but which it lost through decisions of the state court holding them inapplicable to its road under the granting act and the state law passed in pursuance of it.  P. 123.

In such case the obligation respecting the mails cannot be escaped upon the ground that the contract between the company and the State, resting on an entire consideration, in part illegal, was void, where the United States was not a party to the contract and where its reversionary title was relinquished by Congress to the State.  *Id.*

53 Ct. Clms. 473, affirmed.

THE case is stated in the opinion.

*Mr. Theo. D. Halpin,* with whom *Mr. Harrison Geer, Mr. L. T. Michener* and *Mr. P. G. Michener* were on the briefs, for appellant:

The land grant is the consideration for the promise of the railroad to carry mails at a price fixed by Congress. *Rogers* v. *P. H. & L. M. R. R. Co.,* 45 Michigan, 460; *Union Pacific R. R. Co.* v. *United States,* 104 U. S. 662; *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 225 U. S. 640.

In making contracts, the United States lays aside its sovereignty and its contracts are tested as to validity by the same principles which govern in other cases.

The attempted contract between the State and the Port Huron & Lake Michigan Railroad Company, whereby the former undertook to grant lands not only east of Flint, where the railroad had already been constructed, but lands west of Flint, where it was never constructed, was void for illegality, because made in violation of the trust, in full force and effect at the time, under which the State held the land from the United States.  *Bowes* v. *Haywood,* 35 Michigan, 241; *Fenn* v. *Kinsey,* 45 Michigan, 446;

*Schulenberg* v. *Harriman*, 21 Wall. 44; *Swann* v. *Miller*, 82 Alabama, 530. The acceptance of the railroad company failed to complete a binding contract because the major part of the consideration moving to the Port Huron & Lake Michigan Railroad Company was void for illegality and the consideration was indivisible.

There are no means to ascertain whether the promise of the railroad was induced by the legal or illegal portion of the consideration.

The act of Congress making the grant contemplated a grant of six sections per mile, or 230,400 acres for the sixty miles of road between Port Huron and Flint. The available land between Port Huron and Flint was about three per cent. of this, and less than the amount called for by the act for the construction of two miles of road. To hold the railroad to its promise in consideration of the grant of about six thousand acres, is to make an entirely different contract than that contemplated by all parties when the illegal contract was entered into.

The railroad between Port Huron and Flint was not constructed in whole or in part by a land grant made by Congress. *United States* v. *Alabama Great Southern R. R. Co.*, 142 U. S. 615. The Act of June 3, 1856, requires that the lands granted shall aid or be exclusively applied in the construction of the road—help construct it—and forbids the application of the statutes to a road not so aided or helped. The road so constructed is a land aided or land grant road, and not otherwise. 1 Ops. Asst. Atty. Gen., P. O. Dept., 777, 875, 879; 2 *ibid.*, 312; *Coler* v. *Board of Commissioners*, 89 Fed. Rep. 257; *De Graff* v. *St. Paul & Pacific R. R. Co.*, 23 Minnesota, 144; *Chicago, Milwaukee & St. Paul R. R. Co.* v. *United States*, 14 Ct. Clms. 125; *s. c.* 104 U. S. 687–689. Such aid must be established as a fact, to bind the railroad.

When the Act of July 12, 1876, went into effect, at a time when all the facts were fresh and easily ascertained,

the Post Office Department commenced to treat the road as a non-land grant road, and so continued for thirty-six years. It had been treated as a non-land grant road for twenty-four years when the plaintiff acquired it by purchase, in 1900. The sixty-six miles had been completed before the land was granted. It had been so far constructed and completed by January 1, 1872, that on that date it commenced to carry the mail under contract with the Post Office Department. It is not shown, nor was it attempted to be, that any part of the proceeds of the land aided in the construction of the road, or, in fact, ever reached the railroad company.

The Port Huron & Lake Michigan Railroad took title to the lands east of Flint as a gift or subsidy under the Act of the Michigan legislature, approved June 9, 1881, and not under the patent of May 30, 1873.

The appellant is not estopped to claim that there is no valid contract. It did not receive the lands. The reasons given for holding that the Port Huron & Lake Michigan Railroad Company was estopped, are unconvincing even as applied to that railroad. It did not seek the conveyance of the lands east of Flint except as it sought the conveyance of all the lands. It accepted the conveyance of all the lands "in terms" and proceeded to exercise control and disposition of all of them, and there is no fact in the record to show that it ever exercised control and disposition of the lands east, as separate from the lands west.

The trustee was a trustee of all the lands and the record is barren of any act of that trustee relating to the lands east of Flint, although it does show that he acted as to the lands west, involved in *Bowes* v. *Haywood, supra; Fenn* v. *Kinsey, supra.*

The road did not ask for the lands east of Flint at any time when the lands west of Flint were not included, and when it "solemnly accepted the grant," it must be borne

in mind that the acceptance was not of 6,400 acres, but of more than 36,000.

We submit that there are here none of the elements of estoppel. There has been no change of position by this claimant, or any of the previous owners of the road, to the detriment of the United States. On the contrary, all of them and the United States, until November 27, 1912, acted on the theory and in the belief that the road between Port Huron and Flint was not a land-aided road. For forty years all the parties concerned, the owning companies and the United States, acted upon a theory, a practice and a construction directly contrary to the view that the road between those points was land-aided. If the doctrine of estoppel is applicable here, it is against the United States alone.

Legal rights are not lost by the silence or inaction of one party that does not produce a change of position resulting injuriously to others. *Jones* v. *United States*, 96 U. S. 24, 29; *Pickard* v. *Sears*, 6 Ad. & El. 469, 474; *Hawes* v. *Marchant*, 1 Curtis C. C. 136, 144.

The Government is bound by the departmental construction extending over forty years. *United States* v. *Alabama Great Southern R. R. Co.*, 142 U. S. 615, and other cases.

*Mr. Assistant Attorney General Spellacy*, with whom *Mr. Leonard B. Zeisler* and *Mr. Charles H. Weston*, Special Assistants to the Attorney General, were on the brief, for the United States.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The railroad from Port Huron to Flint, in Michigan, sixty miles in length, was completed on December 12, 1871. It was built by the Port Huron and Lake Michigan Railroad Company. By foreclosure of a mortgage executed

by that corporation and several consolidations it became on October 31, 1900, the property of the Grand Trunk Western Railway Company and has since been a part of its system.   For forty-one years after the completion of this sixty-mile road the mails were carried over it by the successive owners under the usual postal contracts and payment was made for the service quarterly at full rates.   In 1912 the Postmaster General, concluding that this was a land-aided railroad within the provisions of § 13 of the Act of July 12, 1876, c. 179, 19 Stat. 78, 82,[1] restated the account for the twelve full years during which the road had been operated by the Grand Trunk Western.   Twenty per cent. of the mail pay for that period was found to be $50,359.70; and this amount he deducted from sums accruing to the company under the current mail contract. He also reduced by twenty per cent. the amount otherwise payable under the current contract for carrying the mail over this part of its system.   Thus he deducted altogether $52,566.87 from the amount payable on June 30, 1913. The road had in fact been built without any aid through grant of public lands.   None had passed to the Grand Trunk Western when it acquired the road; and, so far as appears, that company had no actual knowledge that any of its predecessors in title had acquired any public land because of its construction.   The company insisted that the $52,566.87 thus deducted from its mail pay was withheld without warrant in law, and brought this suit in the Court of Claims to recover the amount.   53 Ct. Clms. 473.   Its petition was dismissed and the case comes here on appeal.   Whether the company is entitled to relief depends upon the legal effect of the following facts.

[1] "Sec. 13.   That rail-road-companies whose railroad was constructed in whole or in part by a land-grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct shall receive only eighty per centum of the compensation authorized by this act."

By Act of June 3, 1856, c. 44, 11 Stat. 21, Congress granted to Michigan public land to aid in the construction of certain lines of railroad, a part extending easterly of Flint to Port Huron—another part, westerly of Flint to Grand Haven. The act contained in § 5 the usual mail provision.[1] In 1857 the legislature of Michigan granted these lands to two companies on condition that they accept the obligations of the grant within sixty days. [Act of February 14, 1857, Laws Mich., 1857, p. 346.] Each company filed within the specified time a partial acceptance, refusing to accede to the taxation features of the grant. Thereupon the rights of each to any part of the public lands was declared forfeited by the state authorities for failure to comply with the state legislation. Subsequently the companies filed maps of definite location in the General Land Office of the Interior Department, which were approved by that office; and on June 3, 1863, the Secretary of the Interior certified to the Governor of Michigan 30,998.76 acres of land lying west of Flint for the company which was to build the line from Grand Haven to Flint, the Detroit and Milwaukee Railway Company. On November 1, 1864, he certified 6,428.68 acres, all but 97 40/100 acres of which lay east of Flint, for the company which was to build the line from Flint to Port Huron, the Port Huron and Milwaukee Railway Company. Neither company constructed its line nor received any patent for land. The rights of way and other property of the Port Huron and Milwaukee Railway Company passed through a foreclosure sale to the Port Huron and Lake Michigan Railroad Company; and this corporation built the road in question during the years 1869, 1870 and 1871.

---

[1] "Sec. 5. *And be it further enacted*, That the United States mail shall be transported over said roads, under the direction of the Post-Office Department, at such price as Congress may, by law, direct: *Provided*, That until such price is fixed by law, the Postmaster-General shall have the power to determine the same."

But it made no application for any part of these lands until three weeks before the completion of the road. Then, on November 18, 1871, it petitioned the State Board of Control, which was charged with the disposition of the public lands, to confer upon it both the 30,998.76 acres west of Flint and the 6,428.68 acres east of Flint which the Secretary of the Interior had certified; and in so applying it asked for the land "for the purpose of aiding in the construction" of its contemplated railroad which was described as extending from Grand Haven to Flint and thence to Port Huron. The board approved of making the grant "for the purpose of aiding in the construction of the road;" but no further action was taken until May 1, 1873, when upon a new petition of the company which recited the former proceedings and the completion of "sixty miles of the unfinished portion of said line" the board directed the transfer of all the land to it. The resolution of the board was followed on May 30, 1873, by a patent for all the land from the Governor of the State, its formal acceptance by the company subject to the provisions of the Act of Congress of June 3, 1856, and action by it to take possession of the land and to dispose of it for the benefit of the company. In 1877 the Supreme Court of Michigan held in *Bowes* v. *Haywood,* 35 Michigan, 241, that the patent so far as it purported to transfer the 30,998.76 acres west of Flint was void under the Michigan legislation, because there had not, in fact, been any claim or pretence that the company ever contemplated building the line west of Flint; and in *Fenn* v. *Kinsey,* 45 Michigan, 446, (1881), that court held that an act of the Michigan legislature passed May 14, 1877, which purported to ratify the patent, was inoperative so far as it concerned the lands west of Flint because it impaired rights reserved to the United States by the Act of June 3, 1856. Meanwhile, Congress had relinquished to Michigan, by Joint Resolution of March 3, 1879, No. 15, 20 Stat. 490, its reversionary

interest in the lands;[1] and thereafter the legislature of Michigan (Act of June 9, 1881, Laws Mich., 1881, p. 362), ratified as to the six thousand acres east of Flint, the action theretofore taken by the state authorities, declaring also that "all deeds and conveyances heretofore executed by the Port Huron and Lake Michigan railroad company" "shall be deemed of full force and effect" and that the "rest and residue of said lands is vested in said company, its successor or assigns." Whether there remained then any land which had not been disposed of by that company or one of its successors does not appear; but it does appear that when in 1875 proceedings were taken to foreclose the mortgage under which the appellant claims title to the road, the trustee to whom the lands had been transferred for the company's benefit was joined for the purpose of including all such interest in the property to be sold.

The Act of June 3, 1856, had contemplated a grant of six sections (3,840 acres) per mile of road to be constructed. That would have been 230,400 acres for the sixty miles. The company which built them and those claiming under it received at most 6,428 acres. The case is one of apparent hardship. Was the judgment of the Court of Claims denying relief required by the applicable rules of law?

*First:* If the railroad was land-aided, payment of more than eighty per cent. of the full rates otherwise provided by law was unauthorized; and it was the duty of the Postmaster General to seek to recover the overpayment. Rev.

---

[1] Resolution of March 3, 1879, "That the United States hereby releases to the State of Michigan any and all reversionary interest which may remain in the United States in such of the lands granted to, and acquired by the said State of Michigan by act of Congress of June third, eighteen hundred and fifty-six, and certified to the said State in accordance with the said act, as were granted to aid the construction of the road from Grand Haven to Flint, and thence to Port Huron. This release shall not in any manner affect any legal or equitable rights in said lands, which have been acquired, but all such rights shall be and remain unimpaired."

Stats., § 4057.   He was under no obligation to establish
the illegality by suit.   Having satisfied himself of the fact
he was at liberty to deduct the amount of the overpay-
ment from the monies otherwise payable to the company
to which the overpayment had been made.   *Wisconsin
Central R. R. Co.* v. *United States,* 164 U. S. 190.   There
was no attempt to include in the deduction any alleged
overpayment to any of appellant's predecessors in title.
Balances due for carrying the mails, although arising
under successive quadrennial contracts, are regarded as
running accounts, and monies paid in violation of law
upon balances certified by the accounting officers may be
recovered by means of a later debit in these accounts.   It
matters not how long a time elapsed before the error in
making the overpayment was discovered or how long the
attempt to recover it was deferred.   The statute of lim-
itations does not ordinarily run against the United States
and would not present a bar to a suit for the amount.
See *United States* v. *Thompson,* 98 U. S. 486.   It is true
that when a department charged with the execution of a
statute gives it a construction and acts upon that construc-
tion uniformly for a series of years, the court will look
with disfavor upon a change whereby parties who have
contracted with the Government upon the faith of that
construction would be injured.   *United States* v. *Alabama
Great Southern R. R. Co.,* 142 U. S. 615.   But here the
practice long continued of paying the full rate instead of
eighty per cent. thereof was not due to any construction
of a statute which the department later sought to aban-
don, but to what is alleged to be a mistake of fact—due
perhaps to an oversight.   To such a case the rule of long-
continued construction has no application.   The appellant
must be held to have taken the road with notice of the
burdens legally imposed upon it.

*Second:* If the road was land-aided, it is immaterial that
the company which later carries the mail over it received

none of the land and obtained no benefit from the grant. The obligation to carry mails at eighty per cent. of rates otherwise payable attached to the road like an easement or charge; and it affects every carrier who may thereafter use the railroad, whatever the nature of the tenure. *Chicago, St. Paul, etc., Ry. Co.* v. *United States,* 217 U. S. 180. The appellant expressly disclaims any contention that the mail clause should not apply because the quantity of land covered by the grant was small as compared with that contemplated by the Act of June 3, 1856, and with the cost of the road.

*Third:* It is contended that this railroad was not land-aided, because it had, in fact, been completed without the aid either of funds or of credit derived from these public lands. Whether the Port Huron and Lake Michigan Company which built the railroad was in fact aided by the land grant in so doing is immaterial. Before the road had been fully completed it asked that the land be granted to it in aid of the construction, and for this purpose only could the grant be made under the act of Congress. It accepted from the State a patent for the land which recited that such was the purpose of the conveyance; and it expressly assented to the terms and conditions of the grant imposed by the Act of June 3, 1856. Thereafter it proceeded to dispose of the land. Throughout this period the Port Huron and Lake Michigan Company remained the owner of the railroad. It had been authorized by its charter to receive the land-grant and necessarily to assent to the conditions upon which alone the grant could be made to it. It is true that the mortgage upon its property, under which appellant claims title, was executed before the company had applied for the grant; and it does not appear that the mortgage purported specifically to cover public lands; but the trustee under the mortgage claimed these lands as after acquired property and the company's interest in them was, by special proceeding, made subject

to the foreclosure proceedings.  The appellant is there-
fore in no better position than the Port Huron and Lake
Michigan Company to question the charge upon the rail-
road imposed ·by acceptance of the grant.

*Fourth:* Appellant points to the fact that the patent to
the lands lying west of Flint was later held to be void by
the Supreme Court of the State; and insists that thereby
the charge or condition concerning the carriage of the
mail must be held to have been relinquished.  But the
patent to the lands east of Flint never was declared void;
the company's title to them never was questioned; and
the objection to the patent to the western lands did not
apply to them.  That objection was that the Port Huron
and Lake Michigan Railway Company was not a "com-
petent party" to receive the western lands within the
meaning of the eleventh section of the Michigan Act of
1857, because it did not propose to construct a line from
Grand Haven to Owosso.  *Bowes* v. *Haywood, supra,* 246.
And the attempt by the legislature to make it a "compe-
tent party" through the Act of 1877 violated the obliga-
tions of the Federal Government's grant.  *Fenn* v. *Kinsey,
supra.*  The only flaw in the title to the lands east of Flint
lay in the fact that the railway had not been completed
within ten years of the Act of June 3, 1856, as required by
that act.  This requirement, however, was a condition
subsequently annexed to an estate in fee, and the title re-
mained valid until the Federal Government should take
action by legislation or judicial proceedings to enforce a
forfeiture of the estate.  *Schulenberg* v. *Harriman,* 21 Wall.
44, 63–64; *Railroad Land Co.* v. *Courtright,* 21 Wall. 310,
316.  So far from doing so Congress relinquished by joint
resolution its reversionary interest in the land, and thereby
removed all possibility of objection on its part to the valid-
ity of the patent; and the State of Michigan later ratified
the patent by legislation admitted to be valid.

*Fifth:* The appellant urges that the illegality of the pat-

ent to the western lands constituted a failure of consideration which voided the contract with the Government. The burden of the mail clause, it says, could be imposed only by contract between the Government and Port Huron and Lake Michigan Company. The contract was for land west as well as east of Flint—and the land west could legally be granted only if the company contemplated building the road westward to Grand Haven. As there was not even a pretence that it contemplated such construction, the contract was illegal. The Government's claim under the mail clause must fail, because no rights can be acquired under an illegal contract. So the appellant contends. Such a view is the result of regarding the transaction as a promise by the railway to the Government to carry the mail at a price fixed by Congress, on consideration of 36,000 acres of public land. A contract of this sort would create a purely personal obligation attaching "to the company, and not to the property,"— clearly not to a mere licensee. However, it is settled that the obligation in question is not of this nature but does attach to the property, even when used by a licensee. *Chicago, St. Paul, etc., Ry. Co.* v. *United States,* 217 U. S. 180. The obligation of a land-aided railway to carry the mail at a price fixed by Congress is a charge upon the property. The public lands were granted to Michigan to aid the construction of certain railways upon certain conditions. The legislature of Michigan could not dispose of the lands except in accordance with the terms of the grant. By the Act of February 14, 1857, it accepted the grant and enacted legislation to give legal effect to the conditions of it. Section 4 of the act is as follows:

"Said railroads shall be and forever remain public highways for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States; and the United States mail shall be transported over said railroads,

under the direction of the post-office department, at such price as Congress may by law direct.   .   .   ."

The order of the Board of Control of May 1, 1873, directing the transfer of the land to the Port Huron and Lake Michigan Company, and the patent issued by the Governor were founded upon the authority of § 11 of this act; and under date of May 30, 1873, the company accepted the lands with the burdens they imposed.  The railroad, whose owners and constructors accepted aid derived from these lands, became charged by operation of law with the burden of transporting the mails.  The question whether that company would have accepted the land with its burdens if it had foreseen the invalidity of the title to the western lands, is wholly immaterial.  The burden attached upon the acceptance of any aid whatsoever no matter how disproportionate to the cost of constructing the portion so aided.

The transaction called illegal was one between the company and the state authorities.  The United States was no party to it.  It had merely supplied property which the parties to it used.  The Government never objected to the disposition made of it; and evidenced its approval by passage of the Joint Resolution of March 3, 1879.  No reason exists why rights by way of charge upon the railroad which were acquired by the Government through the acceptance of six thousand acres of public land, should be invalidated by the alleged illegality of the state authorities' action in issuing a patent to a wholly different tract.

*Affirmed.*