## UNITED STATES v. SUTTON CHEMICAL CO.

(Circuit Court of Appeals, Fourth Circuit. January 12, 1926.)

No. 2394.

United States ⚖➡75—United States held entitled to sue to recover money paid by its agents under improvident settlement agreement respecting canceled war contract.

United States is not bound by payments made by its agents under improvident settlement agreement made with war supply contractor on cancellation of contract, but may sue to recover amounts improperly paid under mistake of fact or of law.

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; George W. McClintic, Judge.

Suit by the United States against the Sutton Chemical Company. Decree for defendant, and the United States appeals. Reversed and remanded.

Alexander Holtzoff, Sp. Asst. Atty. Gen. (Elliott Northcott, U. S. Atty., of Huntington, W. Va., John G. Sargent, Atty. Gen., and Paul Shipman Andrews and Jerome Michael, Sp. Asst. Attys. Gen., on the brief), for the United States.

W. E. Haymond, of Sutton, W. Va. (Haymond & Fox, of Sutton, W. Va., on the brief), for appellee.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

WADDILL, Circuit Judge. The appellant, the United States government, was the plaintiff in the District Court, and the appellee, a corporation existing under the laws of West Virginia, having its chief place of business in the town of Sutton, in that state, was the defendant. The parties will be hereinafter referred to by their titles in that court.

The controversy arose under two certain war contracts between the plaintiff and the defendant, bearing date the 15th of April, 1918, one No. 3549 (being order No. 168) and the other No. 3551 (order No. 170), which provided for the construction of a chemical plant and the production of acetate of lime and methyl alcohol. The bill alleged, in effect, that the contracts recited the existence of a condition of war between the United States and Germany, and that, because thereof, need had arisen for large quantities of acetate of lime and methyl alcohol for the purpose of prosecuting the war, which the plaintiff did not have at its disposal, and which the defendant in part contracted to furnish. The subject of contract No. 3549 (Exhibit A, page 54, Record) was the entire output of acetate of lime and methyl alcohol, same to be delivered to the government at 4 cents a pound for acetate of lime and 50 cents a gallon for methyl alcohol; the government agreeing to take the entire output of the plant for the first 18 months after its erection and construction, up to 2,720 tons of acetate of lime and 272,000 gallons of methyl alcohol. The subject of contract No. 3551 (Exhibit B, page 68, Record) was the erection of an 80-cord wood chemical plant at Sutton, W. Va., with a daily capacity of approximately 16,000 pounds of acetate of lime and 800 gallons of methyl alcohol, at an estimated cost to the government of $320,000, with the right on the part of the contractor to repurchase the same upon the terms and conditions named in said contract. The title to the plant was to be in the United States.

The bill further alleged that on the 10th of August, 1918, the plaintiff purchased from the defendant a tract of land in Braxton county, W. Va., with the purpose of erecting upon it a temporary plant for the manufacture of acetate of lime and methyl alcohol, as above set forth; that prior to that date the land had been appropriated by the defendant for the purpose of the erection of a chemical plant, and construction had actually been started thereon, and to some extent prosecuted, in accordance with contract No. 3551; that the contract between the parties contemplated the erection of a temporary chemical plant, and one which could be cheaply and expeditiously completed and operated; that, instead of so constructing the

same, it was constructed by the defendant of materials of a most permanent character, adapted and designed for a permanent and high-class chemical plant, thus wrongfully and unlawfully greatly enhancing the expense of construction, and so delaying the completion of the same that the government lost the entire benefit expected to be derived from the undertaking; that the defendant failed to proceed in the construction of the plant with reasonable promptness, although it knew that time was of the essence of the undertaking; that the defendant neither furnished employees with which to complete the contemplated plant, nor provided the means with which to pay the workmen or secure necessary supplies, and that it greatly increased the costs to the government, by failing to stop operation and in continuing to incur further commitments after receiving notice of the termination of the contract; that from said several causes the government was put to heavy and unnecessary expense, and had to forego entirely the receipt of any of the much-desired chemical, to its great loss and damage, until after the signing of the Armistice.

The bill further alleged that in each of the contracts of the 15th of April, 1918, Nos. 3549 and 3551, was contained a cancellation provision whereby the government, in No. 3549, in the event of the cessation of hostilities by it, or its signing a general armistice, and in No. 3551, upon the failure of the defendant contractor to properly carry out the same, might cancel them, and that in the first-named contract, No. 3549, in the event of its cancellation by the government, the government was to reimburse the contractor for all commitments incurred by it, and, on the other hand, the contractor was to use its best efforts to liquidate all such obligations and commitments at the least possible expense to the government; and it was further provided that, in the event of the termination of the contract, the fair valuation of the plant and machinery and equipment should be determined by a board to be chosen as specified in the contract, namely, one appraiser to be selected by the contractor, one by the chief signal officer of the United States Army, and the third by those two, the decision of such board to be final.

In pursuance of the provisions for the termination of the contracts, on the 29th of November, 1918, the proper authorities of the War Department wired the defendant, notifying it to stop all production and building, and to incur no further expense in connection with the transactions in question. On the 3d of December, 1918, a copy of the telegram was forwarded to defendant in a written communication advising that the purpose of the telegram was in effect to cancel the contracts: This communication was as follows:

"December 3, 1918.
"Office Director of Aircraft Production, Sutton Chemical Co., Sutton, West Virginia. Suspension of work.

"1. This letter confirms our telegram to you of November 29, 1918, reading as follows:

"'Stop all production on buildings and incur no further expense in connection with orders one seven one and one six eight, contracts three five five one and three five four nine, covering erection of plant and furnishing of two thousand seven hundred twenty tons acetate of lime and two hundred seventy-two thousand gallons methyl alcohol. Acknowledge receipt.'

"2. Owing to certain technical government laws and regulations it would work hardship on a contractor if this office were to cancel this contract outright. You will, however, understand that the request that you stop production is intended virtually to effect a cancellation, except as to the quantities specified for production.

"3. In this connection you are advised that you should engage no new labor or replace labor without the prior approval of this office. All Sunday, night, and overtime labor should be discontinued. No new contracts should be made with supplies or subcontractors without first obtaining the prior approval of this office.

"4. The Finance Division of this Bureau will make an investigation as to the expenses incurred by you which are chargeable to this contract, and will furthermore endeavor to arrive at a tentative basis of settlement with your company, subject to final approval by the Bureau of Aircraft Production in Washington.

"By direction of the Director of Aircraft Production.

"A. C. Downey, Lt. Col. A. S. A. P."

On the 12th of December, 1918, acting under the settlement provisions of the two contracts, Nos. 3549 and 3551, an agreement purporting to settle all obligations, claims, and demands growing out of both of the said contracts was entered upon; the same being signed by the defendant contractor and an army officer designated by the government for the purpose. Their action was approved on the 12th and 16th days of December, 1918,

by the Board of Contract Review of the Bureau of Aircraft Production. The settlement thus entered into is assailed by the government as most unfair and unjust, resulting, as is claimed by it, as follows:

"The outcome of the transaction was thus most astounding. It was estimated in the original contracts that, bearing in mind war-time prices, the cost of the entire temporary plant would be approximately $320,000. Instead of that the government paid out a total sum of $375,000 for a plant only 40 per cent. completed. Yet within a few days after the contract was canceled the parties agreed that the fair value of the property was only $187,000—or only 50 per cent. of the moneys expended by the government during the few months immediately preceding.

"The plant was conveyed by the government to the contractor at that price, and the government in addition paid the defendant the sum of $187,000 in cash, in order to make up the total of $375,000. In other words, the government turned the plant and the land over to the contractor and paid it $187,000 in cash to boot."

The government charges that the action on the part of its officers in entering into the settlement agreement was both improvident and unfair to it, and that the same was made without taking the necessary steps for the appraisal of the property by a board of three impartial appraisers, in order to safeguard the government's interests as to the plant to be appraised, and that, from every equitable consideration, the transaction should be set aside, and upon a proper accounting the United States should be paid back the amount thus improperly and illegally diverted from it.

The case was disposed of in the District Court upon the pleadings, on the original bill, answer thereto, and exhibits, and upon the amended bill, answer thereto, and exhibits, and upon the motion of the defendant to dismiss. The District Court, by its decree of the 20th of April, 1925, appealed from herein, dismissed the bill because of lack of equity. The assignments of error present the propriety of this ruling as the single question for determination.

It is earnestly insisted on behalf of the government that it is not bound by any waiver on the part of any of its officers, or by their negligence in the performance of their duties, or their consent to or acquiescence in any course or policy, pursued under an erroneous interpretation placed upon any contract or agreement had with the defendant, whereby there was caused to be paid to such defendant moneys of the government that did not belong to the defendant; that the engineers and representatives of the government had no authority to waive any of the government's rights, or to consent to a modification or deviation from the contract for construction of the plant in question, nor is the government precluded from recovering moneys improperly paid out by it as a result of the improvident acquiescence in or negligence of persons designated to make settlement under the contracts in question.

The government's contention, briefly, is that, as a general proposition of law, established by a long line of decisions, it may always recover back moneys improperly paid by its officers to persons not entitled thereto; that it is immaterial whether such payments are made under a mistake of law or of fact; whether because in excess of authority, or based upon an erroneous interpretation of a contract later found to be incorrect, or because of the reliance upon facts found subsequently not to exist; that in all such cases, when it can be shown that the money was paid out without legal liability therefor, a refund can be lawfully enforced; and that the rules as to the binding effect of an account stated, or a compromise, or a settlement in accord and satisfaction, between private persons, are not applicable to the government. The government further claims that actions on the part of its agents, charged with the paying out of moneys, are not final determinations, and do not preclude or estop it from subsequently securing the return of an overpayment. Authorities to sustain these general propositions are cited by the government. Sutton v. United States, 41 S. Ct. 563, 256 U. S. 575, 65 L. Ed. 1099, 19 A. L. R. 403; Pine Logging Co. v. United States, 22 S. Ct. 920, 186 U. S. 279, 46 L. Ed. 1164; Wisconsin Central Railroad v. United States, 17 S. Ct. 45, 164 U. S. 190, 41 L. Ed. 399. In the last-named case, which involved the question of amount to be paid a contractor for carrying the mails, Mr. Chief Justice Fuller said:

"The Postmaster General, in directing payment of compensation for mail transportation, under the statutes providing the rate and basis thereof, does not act judicially, and whatever the conclusiveness of executive acts so far as executive departments are concerned, as a rule of administration, it has long been settled that the action of executive officers in matters of account and payment cannot be regarded as a conclusive determination when brought in question in a court of justice."

In Steele v. United States, 5 S. Ct. 396, 398, 113 U. S. 128, 134 (28 L. Ed. 952) and Chorpenning v. United States, 94 U. S. 397, 399 (24 L. Ed. 126) the Supreme Court had under consideration the same question, and in the first-named case, Steele v. United States, said:

"The fact that the account of the appellant was settled by the officers of the Navy Department, by charging him with the value of the old material at $2,000, is no bar to the recovery of its real value by the government."

In the second case, Chorpenning v. United States, the court said further on this subject:

"The idea that the government is finally concluded by the results at which they may arrive would be regarded as a novelty within and without the several departments."

In the very recent decision of the Supreme Court, likewise involving consideration for carrying the mails by a land-grant railroad, Grand Trunk Western Railroad v. United States, 40 S. Ct. 309, 252 U. S. 112, 64 L. Ed. 484, the court readjusted the accounts of the railroad for a period of 12 years, and, although recognizing that the case was one of hardship, the railroad having acted in the utmost good faith, held that the government was entitled to a refund of overpayments exceeding $50,000. See, also, United States v. Saunders, 79 F. 407, 24 C. C. A. 649 (C. C. A. 1st Circuit); United States v. Gillmore (C. C.) 189 F. 761; United States v. Walsh, 115 F. 697, 52 C. C. A. 419 (C. C. A. 2d Circuit); United States v. Kerr (C. C.) 196 F. 503.

The authorities cited strongly support the contention made by the government as to its right to recover, assuming the existence of such a state of facts here as to make applicable the doctrines invoked. We feel that under the authorities the government has the right to sue, though we do not consider that we can intelligently pass upon the merits of the case without knowing more of the details of the several transactions, and what would be the result of a restatement of the accounts as sought. The case in the District Court, as appears from the record, was determined by the judge sustaining the motion to dismiss the bill, which conceded the well-pleaded facts; but, while this is so, it does not appear that the merits of the controversy can be intelligently reached without a clearer knowledge of the facts, which will necessitate the taking of testimony and a statement of the accounts between the parties had in accordance with

the views of both, or one of the parties, at least. This is what we think should now be done in the case: That the order appealed from should be reversed, and the cause remanded to the District Court, to be proceeded with therein in accordance with the views herein expressed.

Reversed.