BUTTE A. & P. RY. CO. v. UNITED
STATES.*

No. 6434.

Circuit Court of Appeals, Ninth Circuit.
Nov. 7, 1932.

See also 38 F.(2d) 871.

D. M. Kelly, of Butte, Mont., Warren Nichols, of Chicago, Ill., and John A. Groeneveld, of Butte, Mont., for appellant.

Wellington D. Rankin, U. S. Atty., and Arthur P. Acher, Asst. U. S. Atty., both of Helena, Mont.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge.

Appellant is the owner of a railroad which extends from Butte to Anaconda, in the state of Montana, connecting at Butte with the Northern Pacific Railway. It was operated, under control of the federal government, from January 1, 1918, to September 27, 1918, on which last-mentioned date it was released from control. Thereafter, and from September 28, 1918, to February 29, 1920, it operated under its own management. During the latter period its operating income was $2,079,693.08. Its operating expenses were $1,840,167.95, leaving a net income of $239,-525.13. It claimed from the government that it was entitled under provisions of the Transportation Act of 1920 to reimbursement for decreased income in the amount of $600,-527.35 as for the stated period after it was released from control. The Interstate Commerce Commission, acting on the application of appellant, made its certificate that the railroad company had sustained a deficit in the sum of $487,116.21, which sum in March, 1925, was paid to appellant from the Treasury of the United States. On March 7, 1927, the Commission made its order canceling the certificate upon which payment of the "deficit" amount had been made. In August, 1929, the United States brought this suit to recover the amount so paid to appellant for the alleged reason that payment was unauthorized by the law. The defendant answered the complaint, and the District Court, upon motion, awarded judgment on the pleadings in favor of the government. This appeal was then taken.

Appellant, in its answer made to plaintiff's complaint, admitted that it realized a profit through its own management from the operation of its railroad prior to the termination of federal control, and for the period before stated. It denied that the payment of the money sued for was improperly or illegally made; denied the right of the United States to sue for the recovery of the money; alleged that, as it had disbursed the

*Rehearing denied January 15, 1933.

sum in the payment of dividends, expenses of maintenance and operation, taxes, etc., and had been charged with taxes on the money as being properly possessed by it, the United States was estopped to require repayment.

The Transportation Act, approved February 28, 1920 (41 Stats. page 456), which amended the Interstate Commerce Act (49 USCA § 1 et seq.) provided (section 204) that the federal control of the railroads should terminate on March 1, 1920. It contained many provisions for the adjustment of matters growing out of government administration of the railroads. It determined, among other things (section 204, codified, 49 USCA § 73) that reimbursement should be made to relinquished roads for "deficits" suffered by the latter in "railway operating income" during the time when the government control was operative. This for the apparent reason that short lines not operating under the arrangement whereby "just compensation" was rendered to controlled roads, might by reason of the competition of the controlled roads (the latter being subject to government orders regarding routing and diversion of traffic and wage scales) be unfairly discriminated against. In that connection, section 204, the provisions of which prescribe a complete method for reimbursement of the relinquished lines, declares, first (a) that the term "carrier" as used in the section means "a carrier by railroad which, during any part of the period of Federal control, engaged as a common carrier in general transportation, and competed for traffic, or connected, with a railroad under Federal control, and which sustained a deficit in its railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation. * * * " Also that the "test" period with which the income should be compared, was the three years ending June 30, 1917.

Subdivision (b) refers to computation methods to be used in the accounting: First, railway operating income or deficit for the period of federal control is required to be arrived at by a method "similar" to that specified in section 209 (49 USCA § 77). The latter section contains provisions covering the guaranty period for six months from and after March 1, 1920, application of which is not involved here except for the purposes indicated above. Second, that the method for computing railroad operating income or deficit for the test period shall be that described in section 1 of the Control Act (40 Stats. 451). These references in subdivision (b) furnish the guide as to the proper items to be considered in casting totals in operating income or deficit during the respective periods. Particular calculations are then to be made in respect of arriving at the credit to be given the carrier on account of deficit in operating income suffered during the control period. The remaining provisions of section 204 are now quoted in full.

"(c) *Ascertainment of amounts of railway operating income and deficits therein; test period return.* As soon as practicable the commission shall ascertain for every carrier, for every month of the period of Federal control during which its railroad or system of transportation was not under Federal operation, its deficit in railway operating income, if any, and its railway operating income, if any (hereinafter called 'Federal control return'), and the average of its deficit in railway operating income, if any, and of its railway operating income, if any, for the three corresponding months of the test period taken together (hereinafter called 'test period return'): Provided, That 'test period return,' in the case of a carrier which operated its railroad or system of transportation for at least one year during, but not for the whole of, the test period, means its railway operating income, or the deficit therein, for the corresponding month during the test period, or the average thereof for the corresponding months during the test period taken together, during which the carrier operated its railroad or system of transportation.

"(d) *Sums to be credited to carrier.* For every month of the period of Federal control during which the railroad or system of transportation of the carrier was not under Federal operation, the commission shall then ascertain (1) the difference between its Federal control return, if a deficit, and its test period return, if a smaller deficit, or (2) the difference between its test period return, if an income, and its Federal control return, if a smaller income, or (3) the sum of its Federal control return, if a deficit, plus its test period return, if an income. The sum of such amounts shall be credited to the carrier.

"(e) *Sums to be credited to United States.* For every such month the commission shall then ascertain (1) the difference between the carrier's Federal control return, if an income, and its test period return, if a smaller income, or (2) the difference between its test period return, if a deficit, and its

Federal control return, if a smaller deficit, or (3) the sum of its Federal control return, if an income, plus its test period return, if a deficit. The sum of such amounts shall be credited to the United States.

"(f) *Payments of difference to carrier.* If the sum of the amounts so credited to the carrier under subdivision (d) of this section exceeds the sum of the amounts so credited to the United States under subdivision (e) of this section, the difference shall be payable to the carrier. In the case of a carrier which operated its railroad or system of transportation for less than a year during, or for none of, the test period, the foregoing computations shall not be used, but there shall be payable to such carrier its deficit in railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation.

"(g) *Certification of amounts payable to carriers; warrants and payment thereof.* The commission shall promptly certify to the Secretary of the Treasury the several amounts payable to carriers under paragraph (f). The Secretary of the Treasury is authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States for the amount shown in such certificate as payable thereto."

Shortly after this act became effective, claims were made by certain released short line roads for reimbursement under the provisions of the section. The Interstate Commerce Commission on the earlier applications determined that reimbursement should be made wherever it is shown that the relinquished lines had suffered a decrease in income during the federal control period, as compared with the test period; in other words, that whether the carrier had operated at a loss during the control period was not a determining factor. Claims were allowed and paid under that construction, although several of the commissioners dissented. 66 I. C. C. 765. Later, claims for many millions of dollars were filed with the Commission to recover for decreased income, and, upon a reconsideration of the question, the Commission reversed its former holding and declared that, in order to have the benefits of section 204 of the Transportation Act the carrier concerned was required to show that it had operated at a loss during the control period. (99 I. C. C. 724.)

It seems to be admitted that the terms of subdivision (a) of section 204, taken alone, entitle a carrier to compensation only when it operated at a loss during the control period. It is argued, however, that this construction is affected by the provisions of subdivisions (c), (d), (e), and (f), which prescribe the method by which the deficit is to be ascertained. This argument is without force when it is considered that subdivision (a) explicitly defines the carrier as to whose income the subsequent provisions are to be applied; the latter provisions are necessarily subordinate to the class definition contained in subdivision (a). It is true enough that, under the method prescribed in (c), (d), (e), and (f), a railroad which had not operated at a loss but had had a continuous (month by month) net profit during federal control, against a greater test period profit, would be shown to have a credit in its favor, which, by subdivision (f), would be payable to the carrier; for the reason that provisions (d) and (e) referring to comparative monthly computations that are to be made, include calculations as to "the difference between its test period return, if an income, and its Federal control return, if a smaller income." But as one of the Commissioners well stated in his dissenting opinion in the earlier decision of the Commission, "This method of monthly calculation was undoubtedly devised for the reason that there was a seasonable variation in traffic and a fair result would be obtained by comparing operating income by separate months with corresponding income during the test period." The construction to be given to the section as a whole seems not to be doubtful. The carrier, under subdivision (a), first determines whether it has suffered a loss in its operating income as a whole, for the period of federal control and while it was not under federal control. If it has suffered such a loss, then the amount of its reimbursement is to be worked out by means of the calculations required to be made under (c), (d), (e), and (f). If it has not suffered such a loss, it has no right to reimbursement. This construction appears to be in harmony with the purpose of Congress. If the construction that a diminution in income compared with the test period is the criterion, then a discrimination would be worked against carriers of the same class which operated for less than a year during the test period; as to which, by subdivision (f), it is provided that the computations described in subdivision (d) and (e) shall not be applied, but that there shall be payable to such carriers "deficit in railway operating income * * * (as a whole) of the period of Federal control during which it operated its own railroad or system of trans-

portation." There is no reason or consistency in construing the reimbursement provision as to the latter roads to limit the right to payment to actual deficit during federal control, and allow other short lines which operated a year or more during the test period to full reimbursement for depreciation in income regardless of whether any loss or "deficit" was suffered. The argument that a short line having a deficit in operating income under its own operation during federal control is given unfair advantage over roads not suffering such deficit, but producing but a small income, is beside the question, for the right of Congress to define the class of carrier entitled to benefits cannot be disputed. There is no real contention made that, where the term "deficit" is used in the subdivisions which prescribe methods of computation, including those contained in the guaranty provisions of section 209 of the act (49 USCA § 77), "deficit" means anything other than an excess of outlay over receipts.

The appellant contends that, even though the Commission misconstrued the act in allowing to the railroad the sum of money which the government seeks to recover, its act is not subject to review by the courts, as the Commission had jurisdiction to determine the matter finally, that it acted judicially, and that its first order must stand. This argument would be difficult to answer were the case one where the railroad had presented itself showing a deficit in its operating returns as compared with the test period and the dispute was as to the particular sum due to it. But, under the admitted facts, its case was not one which the Commission was authorized to consider at all. It has been clearly settled that the courts have full right, when appealed to, to determine, by independent hearing, whether agencies of the government to which have been committed duties involving the exercise of administrative functions, or powers of a judicial nature, have exercised their powers with respect to the particular persons or subject-matter designated by Congress. If the power is lacking, the act is void. This subject in general was discussed at length in the recent decision of the Supreme Court. Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598. See, also, Interstate Commerce Commission v. Ill. Cent. R. R., 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280; Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283; Interstate Commerce Commission v. Union Pac. R. R., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; Tagg Bros. & Moorhead v. United States,

280 U. S. 420, at page 442, 50 S. Ct. 220, 74 L. Ed. 524. The added contention of appellant that the settlement made was one of compromise does not make a different case because the railroad company was not entitled to any amount under the facts as admitted.

The United States may demand repayment of money paid out by its officers or agents where no authority of law exists for such payment. Persons so receiving public funds are charged with knowledge that they have taken that to which they have not the right, and are bound, upon demand, to return it. Decisions determining the question differently where private parties are wholly concerned, are not pertinent. No estoppel as for voluntary payment can be claimed to defeat the suit of the government: Wisconsin Central Ry. v. United States, 164 U. S. 190, 17 S. Ct. 45, 41 L. Ed. 399, cited with approval in Allen v. United States, 204 U. S. 581, 27 S. Ct. 324, 51 L. Ed. 634, and Grand Trunk Western Ry. Co. v. U. S., 252 U. S. 112, 40 S. Ct. 309, 64 L. Ed. 484; Sutton v. United States, 256 U. S. 576, 41 S. Ct. 563, 65 L. Ed. 1099, 19 A. L. R. 403. No conditions are present like those where a person has contracted with a government agency and received payment in return for a consideration actually rendered by him, as the performance of work, and it has later been discovered that the contract was not legally authorized. Here the railroad company returned nothing to the government in exchange for the money received. Plaintiff had only to show that the money was improperly paid as described. What use appellant thereafter made of it is immaterial. No estoppel can be claimed because it disbursed the fund and was taxed because of the possession and claimed ownership of it. The decisions cited affirming the right of the United States to recover public money so paid out without authority of law, as a corollary, must imply that there is no estoppel under conditions such as this case presents.

Appellant makes the further complaint that the action of the court in adjudging that plaintiff was entitled to interest on the principal sum claimed, at the legal rate fixed by the law of the State of Montana where the suit was tried, and from the date of the demand made for repayment, was improper. It is a rule long established that, where a person refuses to return money due to another, a judgment thereafter obtained for the recovery thereof will include interest from the date of the demand. Interest

is generally allowable for "delay in discharging a duty, and therefore in default on a contract to pay money, even without express legislation so directing * * * the rate must be reasonable and conform to the custom which obtains in the community." Billings v. United States, 232 U. S. 261, 34 S. Ct. 421, 426, 58 L. Ed. 596, which cites and quotes from Young v. Godbe, 15 Wall. 562, 21 L. Ed. 250. "Both in law and in equity, interest is allowed on money due." Miller v. Robertson, 266 U. S. 243 at page 258, 45 S. Ct. 73, 78, 69 L. Ed. 265. See, also, Oklahoma State Bank v. Gallon Iron Works & Mfg. Co., 4 F.(2d) 337 (C. C. A. 8); Kishi v. Humble Oil & Ref. Co., 10 F.(2d) 356 (C. C. A. 5). Where interest is allowed, it is at the legal rate fixed by the law of the forum. Mather v. Stokely, 218 F. 764 (C. C. A. 1). In the case last cited, the suit, tried in the Massachusetts district, was brought on covenants on a warranty deed on lands in Florida. The District Court allowed interest at 8 per cent. per annum, being the legal rate in Florida, whereas the rate fixed in Massachusetts was 6 per cent. The Circuit Court of Appeals held that the District Court erred, and that the Massachusetts rate governed. See, also, The Leonie O. Louise, 4 F.(2d) 699 (C. C. A. 5). Decisions of District Judges to the same effect in cases in which the United States was the plaintiff, are United States v. Pan-American Petroleum Company, 24 F.(2d) 206; United States v. Skinner & Eddy Corp., 28 F.(2d) 373; Jones Company v. Canadian Nat. Ry. Co., 14 F.(2d) 852.

No error is found entitling appellant to a reversal of the judgment.

Affirmed.