## UNITED STATES *v.* SANBORN.

## SANBORN *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

Nos. 224, 225. Argued March 21, 1890.—Decided April 28, 1890.

The payment made by the United States to Sanborn, which is the subject of this action, was made in consequence of' a misrepresentation by the defendant to the Secretary of the Treasury, which created a misapprehension, on his part, of the nature of the defendant's services; and the amount so paid ought, in equity and good conscience, to be returned to the United States.

When the United States makes a long delay in the assertion of its right to recover back money which it is entitled to recover back, without showing some reason or excuse for the delay, interest before the commencement of the action for such recovery is not recoverable; and this is especially true when it does not appear that the defendant has earned interest upon the money improperly received by him.

When the United States are successful in a suit where one of their clerks or officers of the class described in Rev. Stat. § 850 is sent· away from his place of business to be a witness for the government, the· necessary expenses of such witness, audited by or under the direction of the court upon which he attends as a witness, takes the·place, in..the bill of costs, of the per diem ·and mileage which, but for that section, would have been taxed and allowed in their favor.

THE case is stated in the opinion.

*Mr. Benjamin F. Butler* and *Mr. O. D. Barrett* for Sanborn:

*Mr. Alphonso Hart*, Solicitor of Internal Revenue, for the United States.

MR. JUSTICE HARLAN delivered the opinion of the court.

These are writs of error from the same judgment. The action was brought by the United States, October 15, 1883, to recover from John D. Sanborn the sum of $7334, on account of moneys alleged to have been received by him from the government without authority of law and without right thereto, with interest on that sum from August 16, 1873. A jury was waived by the written stipulation of the parties and the case was tried by the court, which made a special finding of facts and of law.

It was provided by an act of Congress, approved May 8, 1872, making appropriations for the legislative, executive and judicial expenses of the government for the fiscal year ending June 30, 1873, that " the Secretary of the Treasury shall have power to employ not more than three persons to assist the proper officers of the government in discovering and collecting any money belonging to the United States, whenever the same shall be withheld by any person or corporation, upon such terms and conditions as he shall deem best for the interests of the United States : but no compensation shall be paid to such persons except out of the money and property so secured ; and no person shall be employed under the provisions of this clause who shall not have fully set forth in a written statement, under oath, addressed to the Secretary of the Treasury, the character of the claim out of which he proposes to recover, or assist in recovering moneys for the United States, the laws by the violation of which the same had been withheld, and the name of the person, firm or corporation having thus withheld such moneys." 17 Stat. 69, c. 140.

On the 15th day of July, 1872, Sanborn sent to the Secretary of the Treasury a communication, verified by his oath, submitting a statement under the above act, and proposing to recover, or assist in recovering, moneys due the United States for evasions of, and frauds upon, the laws for the collection of internal revenue tax on spirituous and fermented liquors, as well in making false returns of the amounts manufactured as in evading the payment of taxes upon those returned; and asking to be allowed, in the form of a percentage, such amount from the collections as in the judgment of the Secretary was fit and meet.

This letter was followed by a written contract between Sanborn and the Acting Secretary of the Treasury under date of August 13, 1872, in which it was agreed that the former might proceed to collect the taxes so alleged to be due to the United States by the persons named; that legal proceedings in the premises should be conducted by the proper United States attorneys, the written consent of the Secretary of the Treasury being first obtained; that no settlement of such claims should be made except under the provisions of section 10 of the act of March 3, 1863; that the costs and expenses incurred by him in investigating and prosecuting said claims, of every nature, should be borne by him, and no part thereof paid out of the portion retained by the United States; that whenever required by the Secretary he should make a full report in writing of his acts and proceedings under the contract; that the money collected, either by legal proceedings or "by settlement as compromise," should be placed to the credit of the Secretary of the Treasury, and out of the same there should be paid to Sanborn, in full for his services and for all the costs and expenses of collection, a sum equal to 50 per cent of the gross amount collected and received, which should be paid to him as fast as collected and placed to the credit of the Secretary of the Treasury, the balance to be paid into the Treasury of the United States; and that the contract might be revoked at any time at the pleasure of the Secretary.

On the 25th of October, 1872, Sanborn sent to the Secretary another letter, accompanied by a statement verified by his oath,

asking that his employment be extended and made to relate to claims against the persons whose names were set forth in a schedule annexed to his letter, for moneys illegally withheld by them from the government. "I desire, also," he said, "to state that the foregoing claims, out of which I propose to recover, or assist in recovering, moneys for the United States, arise under the taxes imposed upon legacies and successions and income under the act of July 30, 1864, and subsequent amendatory acts, providing for the collection of taxes for internal revenue. And I further request that the foregoing cases may be brought under my contract with the Secretary of the Treasury, bearing date August 13, 1872."

In the statement referred to in that letter is the following:

"District Waldenham. . . . James A. Burtis . . . John E. Wool."

Pursuant to this request, the Acting Secretary of the Treasury on the 30th of October, 1872, entered into another contract with Sanborn, containing, among other provisions, the following:

"Whereas John D. Sanborn, of the city of Boston, has fully set forth in a written statement signed by him, under oath, and has filed the same in the office of the Secretary of the Treasury, wherein he proposes to recover, or assist the proper officers of the government in recovering, for the United States from the following persons, to wit: . . . John E. Wool estate, . . . large sum of money, that is to say, the sum of fifty thousand dollars, which the said Sanborn claims to be due to the United States, as and for internal revenue taxes which have been withheld by said persons, under and by force of the act of June 30, 1864, and other acts amendatory thereof, imposing taxes upon legacies, successions, and incomes; it is hereby agreed by and between W. A. Richardson, Acting Secretary of the Treasury, of the first part, and the said John D. Sanborn, of the second part, that the contract or agreement entered into by and between the said parties, bearing date August 13, 1872, relating to the proposed recovery of certain moneys alleged to be due to the United States, is hereby extended and enlarged, so as to embrace and

relate to the persons herein specifically enumerated ; and all the provisions, conditions and terms of the said contract of August 13, 1872, shall be held to apply to and control this agreement."

The Secretary, under date of February 3, 1873, issued a paper addressed " To supervisors and collectors of internal revenue," in which he requested them to assist Sanborn " in the examination of official records in reference to such cases of alleged violation of the internal revenue laws as he may ask for your coöperation," stating that he was acting under his appointment, and " may need some information from the offices of collectors and assessors for the purpose of verifying his claims." Subsequently, on the 15th of October, 1873, the Secretary issued a similar circular, and asked supervisors and collectors to render Sanborn such assistance as he required.

General John E. Wool died at Troy, New York, November 10, 1869, leaving a large estate, Mrs. Wool surviving him. His will having been duly probated on the 8th of February, 1870, letters testamentary were issued to John A. Griswold and Asher R. Morgan. Subsequently, October 31, 1872, Griswold died, leaving Morgan as sole executor. Mrs. Wool died May 7, 1873.

On the first day of August, 1873, Morgan delivered to Lucien Hawley, a supervisor of internal revenue, in payment of taxes due from the estate of Wool, his draft, as executor, upon the United States Trust Company of New York, payable to the order of the Secretary of the Treasury, for the sum of $14,668. Hawley delivered it to Sanborn on or about its date, and on the 3d of August, 1873, the latter enclosed it to the Secretary of the Treasury, in a letter of which the following is a copy : "Referring to the contract made by me with the Hon. George S. Boutwell, late Secretary of the Treasury, bearing date August 13, 1872, and as amended by the agreement October 30, 1872, I have the honor to report that Asher R. Morgan, executor of the estate of General John E. Wool, deceased, late of Troy, N. Y., and one of the parties named in my schedule accompanying said contract has paid to me the sum of $14,668, being the full amount of taxes due

the government by him arising from the legal assessment on legacies and successions of said trust, and which has never before been paid. I herewith enclose said sum and respectfully request that one half of the same shall be paid into the Treasury to the credit of the Secretary of the Treasury and that the remaining half thereof shall be paid to me in accordance with the terms of my said contract. Please transmit receipt to Mr. Morgan, No. 7 Beekman Street, New York."

The Secretary of the Treasury on the 9th of August, 1873, endorsed this draft to the order of the Treasurer of the United States, and directed the latter to deposit it to the special credit of the Secretary on account of moneys received and paid under the first section of the legislative, executive and judicial appropriation act, approved May 8, 1872. The draft, having been endorsed by the Treasurer of the United States to the Assistant Treasurer of the United States at New York, was paid by the United States Trust Company, and the proceeds were placed to the special credit of the Secretary of the Treasury.

On the 16th of August, 1873, the Secretary delivered to Sanborn a draft on the Treasurer of the United States for $16,001.34, on account of moneys collected in various cases specified in his contract, and of that sum, the above $7334 were on account of collections from the estate of General Wool. That draft on its face directed the Treasurer to charge its amount to the Secretary's special deposit account of moneys received and paid under the first section of the legislative, executive and judicial appropriation act, approved May 8, 1872. Under date of August 16, 1873, the Secretary enclosed to Morgan a writing, acknowledging "the receipt, through John D. Sanborn, special agent, of the sum of fourteen thousand six hundred and sixty-eight dollars ($14,668), being the amount of taxes on legacies and successions due the government from the estate of the late General John E. Wool, of Troy, N. Y."

It was found as a fact that the United States has never refunded any part of the sum collected from the estate of General Wool; that no demand to have the same refunded has

ever been made ; and tñat the taxes were paid without pro-test. And it was found, as matter of law, that the United States was entitled to recover the said sum of $7334, with interest at the rate of six per cent per annum from August 16, 1873, to the date when judgment should be entered. Judgment was accordingly entered August 14, 1886, in favor of the United States against the defendant for the sum of $13,052.08 damages, and for its costs, which, under the order of the court, were taxed at $83.30.

As by section 125 of the act of June 30, 1864, amended by that of July 13, 1866, 14 Stat. 140, c. 184, a legacy tax was due and payable whenever the party interested was entitled to the enjoyment of the legacy, or to the beneficial interest in the profits accruing therefrom, there was some discussion at the bar in respect to the time when the legacies in question vested in possession and enjoyment; whether immediately upon the death of the testator, as claimed by the defendant, or at the death of the widow, as claimed by the government. The Solicitor of Internal Revenue contends that although the tax was not collectible until Mrs. Wool died, liability therefor arose immediately upon the death of the testator, and that such liability was not discharged, but was saved, by the act of July 14, 1870, abrogating all legacy taxes. 16 Stat. 256. He also contends that these taxes, not being payable until Mrs. Wool died, were not, within the meaning of the act of May 8, 1872, under which this contract of October 30, 1872, with Sanborn purports to have been made, " withheld " from the United States at the time that contract was made. On this last ground he questions the authority of the Secretary of the Treasury to have allowed Sanborn any part of the sum collected from Wool's estate on account of legacies.

It is unnecessary in the present case to examine any of these questions ; for both of the parties to the present suit insist that these taxes were, when collected, legally due from Wool's estate to the government. The defendant insists that they were collected under a valid contract between him and the Secretary of the Treasury. If we assume, for the purposes of this case, that such contract was in all respects valid, and was

broad enough to embrace the collection of legacy taxes from Wool's estate, whether due upon the death of the testator or upon the death of the widow, nevertheless, the judgment below, so far as it recognized the right of the United States to recover the amount paid to the defendant out of the sums received from that estate, must be affirmed. It must be affirmed because the payment was made in the belief, superinduced by Sanborn's representations to the Secretary of the Treasury, that the collection from Wool's estate was made by him. What are the facts, disclosed by the finding of the court below, which justify this conclusion?

Within a few weeks after the death of the widow, Morgan — upon his own motion, without having known Sanborn, and without having the matter brought to his attention by Sanborn, or by any one representing him — wrote to the Secretary of the Treasury asking that the question of a succession and legacy tax from the estate of General Wool be referred to some person having authority to pass upon his liability to pay it. This was followed by a communication, under date of the 12th of July, 1873, by the Commissioner of Internal Revenue, addressed to Collector Masters, in which the former said: "T. J. Cram, of 1817 De Lancey Place, Philadelphia, Pennsylvania, writes: 'Major General Wool, U. S. A., died November 10, 1869, (in Troy, N. Y., his residence,) leaving legacies of $4000 each to my wife and myself. But there was a condition in the will forbidding his executors from paying any legacies until after the death of his wife. . . . Mrs. Wool died 6th May last. The executors propose to retain from the legacies U. S. tax of 6 per cent on payment 18th inst. of the legacies, etc.' There is nothing in the statements above to show that the said legacies are not subject to tax, but the same would appear to be liable, as indicated in Circular 86. (See p. 30, Series 6, No. 1.)"

At the date of General Wool's death Masters was Collector of Internal Revenue, his district including the city of Troy. He and his deputy knew of his death at or about the time it occurred, and knew that he left a large estate. They, also, knew what were the provisions of his will and talked together,

both before and after Mrs. Wool died, in reference to the claim that a legacy tax would be due after her death. Prior to July 31, 1873, Morgan received from the Secretary of the Treasury a letter referring all questions relating to these taxes to Lucien Hawley, supervisor of internal revenue, with whom he had several conversations upon this subject. The collector, Masters, under date of July 31, 1873, addressed a letter to Morgan, as executor, in which he said: "No return has been made to me of the legacies and distributive shares of the estate of the late General John E. Wool, of whose will I am informed you are the only surviving executor who has qualified as such. Inclosed herewith is the 'collector's notice for legacy and succession taxes' and the proper form upon which to make a return of all the legacies and distributive shares arising from personal property, etc., being in your charge and trust as executor as aforesaid. Please make a return to me at your earliest convenience of all such legacies and distributive shares or successions, and all other facts and information as required by law to be made by you as executor." In that letter he enclosed a collector's notice for legacy and succession taxes and the proper blank upon which to make the required return.

It is stated in the finding that about one month after the death of Mrs. Wool the defendant called on Hawley "for aid in the matter of collecting the tax due from the estate of said John E. Wool."

In view of the findings, which, upon this writ of error, we must assume to be true, it is clear that the representation of the defendant to the Secretary of the Treasury, in his letter of August 31, 1873, that the executor of Wool had paid to *him* the sum of $14,668 for taxes due the government on legacies and successions, was not in accordance with the facts. The draft covering the taxes was delivered by the executor of Wool to Hawley, a supervisor of internal revenue, who, instead of sending it directly to the Secretary of the Treasury, as he might properly have done, and as, perhaps, he ought to have done, delivered it to Sanborn, who — so far as the record shows — performed no services in this business, except to call upon Hawley about one month after the death of Mrs.

Wool, and ask his aid in the matter of collecting the taxes claimed from Wool's estate.

It is, however, contended that the court below erred in excluding certain evidence offered by the defendant, which would have disclosed more fully the nature of the services rendered. It is only necessary to say upon this point that the evidence so offered and excluded relates to efforts made by Hawley and his employés to secure the payment of the taxes claimed from Wool's estate. That evidence, if admitted, would have strengthened the case for the government, for it tended to show that what Hawley did was done under his own responsibility and duty as an officer, and not in aid of Sanborn under his contract for the collection of taxes from Wool's estate. The defendant, it is true, communicated to the Secretary of the Treasury, in October, 1872, the fact that the government had a claim against that estate for taxes. But that fact was known long before that time to the collector of the district in which the testator resided at his death, who intended to enforce the rights of the government when the widow died. The defendant is not shown to have performed any services whatever in the matter, except to request the aid of Supervisor Hawley. That, however, did not justify him in representing to the Secretary of the Treasury that *he* had collected those taxes from Wool's estate. In fact, there was no effort upon the part of the executor to evade payment of them. He brought the matter himself to the attention of the Secretary, and sought a decision by competent authority of the question of his liability. As soon as it was determined adversely to him he paid the taxes through the officer to whom the matter was referred by the Secretary and not to Sanborn, of whom he had no knowledge.

The suggestion that Sanborn was entitled to fifty per cent of all collections from the persons named in his contract, by whomsoever, or in whatever mode, such collections were made, is wholly inadmissible. The contract, upon its face, contemplated, as a condition of his receiving compensation, that he should do something of a substantial character in collecting the taxes alleged to be withheld.

We are of opinion that the payment of the $7334 to the defendant was due to a misapprehension, upon the part of the Secretary of the Treasury, as to the nature of his services — a misapprehension resulting from his representations to that officer — and that the amount so paid ought, in equity and good conscience, to be returned to the United States.

But we are of opinion that the court below erred in allowing interest for any time prior to the institution of this action. More than ten years elapsed after the payment to Sanborn before his right to retain the money was questioned by suit or otherwise. When the facts, disclosed by the evidence, were first discovered by the officers of the government whose duty it was to institute legal proceedings against the defendant, does not appear. It is entirely consistent with the record that the long delay which occurred is without excuse. In *Redfield* v. *Ystalyfera Iron Co.*, 110 U. S. 174, the question was whether the plaintiff was entitled, under the circumstances of that case, to recover interest, the action being against a collector, to recover damages for an illegal exaction of customs dues. The court, after observing that interest is recoverable as of right, when reserved expressly in the contract, or when implied by the nature of the promise, said: "But where interest is recoverable not as a part of the contract, but by way of damages, if the plaintiff has been guilty of laches in unreasonably delaying the prosecution of his claim, it may be properly withheld." We think that the same rule should be applied against the government when, in a case like the present one, it has long delayed an assertion of its rights, without showing some reason or excuse for the delay, especially when it does not appear that the defendant has earned interest upon the money improperly received by him.

The writ of error on behalf of the government presents a question of costs that must be determined. After judgment was ordered in the court below for the United States, its attorney submitted a bill of costs, which included, among other items, duly certified, the sums paid for the actual and necessary expenses of four clerks, two in the War Department and two in the Internal Revenue Office at Washington, in

going to and returning from Boston, and in attending the court there, by direction of the government, as witnesses in its behalf.    These sums amounted to $212.20.    The defendant objected to any allowance whatever in the taxation for costs for the travelling or other expenses of witnesses in the employment of the United States.    The question having been submitted to the court, this objection was sustained.    *United States* v. *Sanborn*, 28 Fed. Rep. 299.

The whole subject of fees in the courts of the United States is regulated by chapter 16, title "Judiciary" of the Revised Statutes.    By section 823 it is provided that the fees allowed in that chapter and no other "compensation" shall be taxed and allowed in the courts of the United States, to the officers therein named and to witnesses, except in cases otherwise expressly provided by law; leaving attorneys, solicitors, and proctors to charge and receive from their clients, other than the government, such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or as may be agreed upon between the two parties.    Sections 824 to 827, inclusive, relate to the fees of attorneys, solicitors, and proctors, and section 828 to the fees of clerks.    Section 829 allows a marshal two per centum "for disbursing money to jurors and witnesses and for other expenses," and provides that "in all cases where mileage is allowed to the marshal he may elect to receive the same or his actual travelling expenses to be proved on his oath to the satisfaction of the court."    Section 846 provides: "The accounts of district attorneys, clerks, marshals, and commissioners of Circuit Courts shall be examined and certified by the District Judge of the district for which they are appointed before they are presented to the accounting officers of the Treasury Department for settlement. They shall then be subject to revision upon their merits by said accounting officers, as in case of other public accounts: *Provided*, That no accounts of fees or costs paid to any witness or juror, upon the order of any judge or commissioner, shall be so reëxamined as to charge any marshal for an erroneous taxation of such fees or costs."    Other sections of the

statute bearing more or less upon the question before us are as follows, under the head of "Witnesses' Fees:"

"Sec. 848. For each day's attendance in court, or before any officer pursuant to law, one dollar and fifty cents, and five cents a mile for going from his place of residence to the place of trial or hearing, and five cents a mile for returning. When a witness is subpœnaed in more than one cause between the same parties, at the same court, only one travel fee and one per diem compensation shall be allowed for attendance. Both shall be taxed in the case first disposed of, after which the per diem attendance fee alone shall be taxed in the other cases in the order in which they are disposed of. When a witness is detained in prison for want of security for his appearance, he shall be entitled, in addition to his subsistence, to a compensation of one dollar a day.

"Sec. 849. No officer of the United States Courts, in any State or Territory, or in the District of Columbia, shall be entitled to witness fees for attending before any court or commissioner where he is officiating.

"Sec. 850. When any clerk or other officer of the United States is sent away from his place of business as a witness for the government, his necessary expenses, stated in items and sworn to, in going, returning, and attendance on the court, shall be audited and paid; but no mileage or other compensation in addition to his salary shall in any case be allowed."

"Sec. 855. In cases where the United States are parties, the marshal shall, on the order of the court, to be entered on its minutes, pay to the jurors and witnesses all fees to which they appear by such order to be entitled, which sum shall be allowed him at the Treasury in his accounts."

"Sec. 983. The bill of fees of the clerk, marshal and attorney, and the amount paid printers and witnesses, and lawful fees for exemplifications and copies of papers necessarily obtained for use on trials in cases where by law costs are recoverable in favor of the prevailing party, shall be taxed by a judge or clerk of the court, and be included in and form a portion of a judgment or decree against the losing party. Such taxed bills shall be filed with the papers in the cause."

Upon full consideration of all the provisions of the statute, and in view of the settled practice in different circuits, we are all of opinion that the court below erred in holding that the word " audit " in section 850 means that the necessary expenses of the witnesses, therein provided, are to be audited by the proper executive department or officer, and that nothing was to be taxed for the travel or attendance of the clerks named in the government's bill of costs. The word " audit," in that section, does not necessarily imply that these expenses must be audited, in the first instance, by an executive department or officer. The bill for such expenses is unlike the ordinary claim for per diem and mileage. The statute fixes the amount to be allowed for attendance and mileage to witnesses entitled to claim therefor, and no auditing in respect to such claims is required; whereas, the items that enter into the account of a clerk or other officer, sent away from his place of business as a witness for the government, for his necessary expenses " in going, returning, and attendance on the court," cannot well be known to the court or its clerk, and must be furnished by the witness himself. Those items are to be examined, looked over and adjusted; in other words, they must be audited. The auditing contemplated by section 850 must be done, primarily, in the court in which the case is pending, and where it can be best determined what expenses have been necessarily incurred by the witness. This construction of the section is supported by section 983, which provides that the amount paid, that is, properly paid, to witnesses shall be taxed by a judge or clerk of the court, and be included in and form a portion of the judgment or decree against the losing party; by section 855, providing that in cases where the United States are parties the marshal shall, on the order of the court, to be entered in its minutes, pay to the witnesses all fees to which they appear by such order to be entitled, which sum shall be allowed him at the treasury in his accounts; and by section 846, providing that the accounts of a marshal for fees or costs paid to witnesses, upon the order of any judge or commissioner, shall not be so reëxamined at the treasury as to charge him for an erroneous taxation of such fees or costs.

It is not disputed that the United States, if successful in a suit, is entitled to have included in the judgment the statutory fees for per diem and mileage for its witnesses, other than its officers who may be sent away from their places of business to attend upon a court. And we cannot think it was intended by section 850 to deny to the government the right, when successful in a suit, to have even the necessary expenses of witnesses of the class described in that section included in the judgment for costs; or that the United States intended to remit to its defeated adversary not only witness fees for per diem and mileage, but the necessary expenses of witnesses who happened to be in its employment, and whom it sent away from their places of business to testify in its behalf. As a person of that class receives, while absent, his stipulated salary, and is paid in that way, for his time, it is not deemed just that he should also receive mileage and per diem. But, instead thereof, he is allowed his necessary expenses, which being audited, by or under the direction of the court upon which he attends as a witness, he is entitled to have paid to him; and the government, being under an obligation to pay them, is entitled to have the amount so audited included in its bill of costs, and in any judgment rendered in its favor. In other words, when the government is successful in a suit, the "necessary expenses" of its witnesses, of the class described in section 850, take the place, in its bill of costs, of the per diem and mileage which, but for that section, would have been taxed and allowed in its favor, just as a marshal may elect to take his actual travelling expenses instead of mileage where mileage is allowed to him.

These views find additional support in section 851, which allows the court, subject to certain restrictions, to fix the compensation to be allowed to a seaman or other person sent to this country by a United States minister, chargé d'affairès, consul, captain or commander, to give testimony in a criminal case pending in a court of the United States. This section, as well as section 850, is brought forward from the third section of an act passed in 1853 to regulate "fees and costs" in the Circuit and District Courts of the United States, in

which act both sections appear under the head of " Witnesses Fees." 10 Stat. 167, 168, c. 80. As the court was to fix the compensation to be allowed to witnesses under section 851, it is a reasonable interpretation of section 850 to hold that the auditing therein provided for was also to be, primarily, under its direction.

For the reasons stated, we are of opinion that the court below erred in disallowing the item in the bill of costs of $212.20.

*The judgment is reversed with directions to enter a judgment in favor of the United States for the sum of $7334, with interest at the rate of six per cent per annum from October 15, 1883, the date of the commencement of this action, and for its costs in the court below, as indicated in this opinion.*