**Daniel F. RYAN, individually and in his representative capacity, Ronald Blaze, and Former Savers of Sterling Federal Savings Assn., A Federal Mutual Savings Institution, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 03–617C.

United States Court of Federal Claims.

Sept. 8, 2003.

Howard Alvin Harris, Sedona, Arizona, for plaintiffs.

Arlene Pianko Groner, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

HODGES, Judge.

Plaintiffs claim that banking regulators induced them to invest large sums of money in Sterling Savings and Loan Association, which they lost by fault of the Government. Defendant filed a motion to dismiss for lack of subject matter jurisdiction. We grant defendant's motion.

## BACKGROUND [1]

The Federal Deposit Insurance Corporation insured Sterling Federal Savings and Loan Association, and the Office of Thrift Supervision regulated it. Sterling operated subject to a Capitol Directive that OTS issued in May 1990. The Directive restricted Sterling's investments and other activities because of its history of capital deficiency.

Sterling entered merger negotiations with FBOP Corporation in October 1990. The parties reached agreement in May 1991. The Agreement had a June 30, 1992 amended termination date. Sterling found that its financial condition had improved sometime after signing the Agreement, however, and it wanted to withdraw from the agreement with FBOP.[2]

Sterling applied to OTS and to the state of Illinois in early 1992 to convert from a federal mutual savings and loan association to a state-chartered bank. In March 1992, it sent a notice of termination to FBOP claiming impossibility of performance. The Office of Thrift Supervision directed Sterling to reinstate the Agreement with FBOP because its termination violated the Capital Directive to which Sterling was subject. The Association "refuted OTS efforts to overturn the termination," according to plaintiffs.

The Office of Thrift Supervision advised Sterling on March 31, 1992 that it had conditionally approved the conversion to a state-chartered bank. Sterling no longer wanted the conversion because it was related to the Agreement with FBOP that Sterling had terminated. Approval of the conversion meant that Sterling's compliance with the Agreement no longer was "impossible." FBOP made written demand for performance according to the Agreement in May 1992. When the Association refused, FBOP sued for specific performance and fraud.

Sterling transferred its assets to a newly organized state-chartered bank in September 1992. Account holders of the Association received shares of stock based on the amount of their savings in the old bank. This was a part of the conversion process and a plan to recapitalize the bank. New investors formed an interim corporation that raised $375,000 for the surviving entity, which was created from the merger of Sterling Savings and Sterling Interim. The surviving entity was Sterling Savings Bank, which FBOP added as a defendant in its suit for specific performance.

FBOP won its lawsuit against Sterling. It obtained a judgment of approximately $2.5 million, including $1.2 million in punitive damages for fraud. The court denied Sterling's motion for reconsideration. The Federal Deposit Insurance Corporation and the State of Illinois seized Sterling Savings to prevent FBOP from levying against the bank to collect the judgment.

Plaintiffs filed administrative claims against FDIC and OTS in November 2000. See 28 U.S.C. § 2671. The Federal Deposit Insurance Corporation responded that the claim had not been presented properly, but if it had, the Federal Tort Claims Act did not provide a basis for recovery. The Assistant General Counsel of FDIC wrote plaintiffs that the Tort Claims Act bars claims of "misrepresentation, deceit, or interference with contract rights . . . and for claims based upon the exercise or performance . . . [of] a discretionary function or duty . . . ." See 28 U.S.C. §§ 2680(a)(h). Plaintiffs refiled their administrative claims for damages but neither agency responded.

Plaintiffs sued in this court on March 19, 2003. They seek damages that "are the direct and proximate result of the acts or failures to act of OTS and/or FDIC and each of them." Evidently, plaintiffs base their complaint on the regulators' approval of Sterling's application to become a state-chartered bank, which was a key element of the merger

---

1. All background information is taken from plaintiffs' complaint and attached materials. Sterling Federal Savings and Loan Association was the pre-merger bank. The newly-formed state-chartered bank became Sterling bank. We refer to the earlier entity as Sterling or the Association and the state-chartered bank as Sterling

or bank. The references should be clear in context.

2. FBOP agreed to the termination if Sterling could obtain approval from the regulators for its plan to "survive as [an] independent banking institution."

agreement with FBOP. Also, OTS and FDIC "refus[ed] to come to the aid of Sterling Savings" during its litigation with FBOP, and later prevented it from "prosecut[ing] an appeal ...." [3]

## DISCUSSION

Plaintiffs have the burden of establishing jurisdiction in this court. *See, e.g., Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998). Their suit alleged an implied-in-law contract and a violation of the Federal Tort Claims Act. We issued an order directing plaintiffs to amend their complaint to assert proper jurisdiction. *Ryan v. United States,* No. 03–617 (Fed.Cl. March 26, 2003). Plaintiffs responded by alleging an implied-in-fact contract. They explained that references to torts and implied-in-law contracts were "word processing error[s]." They referred repeatedly to administrative claims for damages in the new complaint and argued fraudulent inducement and bad faith by government regulators.

■ The elements of an implied-in-fact contact are mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance, and authority to bind the United States. *See, e.g., Barrett Refining Corp. v. United States,* 242 F.3d 1055, 1060 (Fed.Cir. 2001). Plaintiffs acknowledge that their implied-in-fact contract with government regulators did not develop from defendant's conduct and it is not evidenced by government documents. We asked for supplemental allegations to support a cause of action based on an implied-in-fact contract.

■ Plaintiffs contended in response that the "totality of the conduct" of OTS and FDIC produced an implied-in-fact contract, and that the regulators should have insulated Sterling from claims against it. They referred to exhibits in the record as support. Those exhibits appear to show the FDIC acting in its regulatory capacity. For example, Exhibit 10 describes the requirements of Tier 1 capital; Exhibit 19 relates to plaintiffs' inquiry concerning supervisory conversion; and Exhibit 20 is the FDIC's approval of plaintiffs' application for conversion to a state-chartered bank.

Plaintiffs argue that the Government's approval of Sterling's conversion to a state-chartered bank while FBOP's lawsuit was pending constituted a breach of defendant's implied duty to protect Sterling from outside claims. Defendant knew that such a lawsuit would harm the newly-formed entity, plaintiffs allege, and they suspect that the regulators' motive was to avoid indemnifying the bank's investors. Further, plaintiffs contend that they lost their investment in Sterling because the Government prevented Sterling from posting an appeal bond when it lost the fraud and breach of contract case with FBOP.

Plaintiffs do not rely on specific documents or the conduct of any government employee but ask that we look at the overall conduct of the regulators. They contend that the regulators induced and encouraged plaintiffs to invest in what they term a "sinking ship." Having approved Sterling's conversion to a state-chartered bank, government regulators had an obligation to insulate Sterling from claims, according to plaintiffs. They charge that such claims resulted in the "financial destruction" of the newly-formed financial institution.

It is not clear what plaintiffs' alleged implied-in-fact contract provides. They apparently believe that the Government's regulatory approval of Sterling's application to become a state-chartered institution created some type of liability. They do not attempt to allege the elements of an implied-in-fact contract. To use just one example, we cannot know if anyone acting for the United States did so with authority because plaintiffs have not alleged who such persons were or what they did.[4] They have not

---

3. This allegation relates to FDIC's refusal to allow the bank to use its assets to secure an appeal bond.

4. "The implied contract between Plaintiffs and the United States did not arise out of any one specific document or by reason of conduct of one specific person. Instead, the contract arose based on the totality of the conduct of O.T.S. and FDIC." *See* Plaintiffs' Supplemental Statement of the Case, filed April 4, 2003 in response to the Order directing plaintiffs to amend their com-

**734**

pinpointed documents or conduct by which the court can establish the elements of an implied-in-fact contract. Plaintiffs are represented by counsel. We are not obligated to search through the "voluminous exhibits" attached to the complaint in hopes finding a legal theory that would support jurisdiction in this court.

### CONCLUSION

Defendant's motion to dismiss for lack of subject matter jurisdiction is GRANTED. The Clerk will dismiss plaintiffs' complaint. Costs to Defendant.

plaint. *See Ryan v. United States,* No. 03–617    (Fed.Cl. March 26, 2003).